UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LUIZ P., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 22-424WES |
| | : | |
| MARTIN O'MALLEY, | : | |
| Commissioner of Social Security, | : | |
| Defendant.[1] | : | |

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Plaintiff Luiz P. is a "younger individual" who did not complete high school and has almost no relevant work; he reports that he was intermittently incarcerated for much of his adult life for various offenses such as disorderly conduct, assault and violating no-contact orders, with the last incarceration ending at the time of the alleged onset of disability in 2014. Tr. 389-91. Effective as of February 27, 2020, he applied for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"). This is the second time Plaintiff has sought disability benefits. His 2019 application was denied at the initial phase on July 25, 2019. Tr. 65. In his current application, Plaintiff alleges that, apparently in 2014,[2] he suffered a serious brain injury from a fall downstairs; he claims disability as of May 1, 2014, based on allegations of "depression, anxiety, don't get along with others, headaches, dizziness, vertigo, memory issues, poor concentration, traumatic skull fracture, balance issues, numbness, weakness, and back pain." Tr. 65; see also Tr. 343, 390. At the hearing on the current application, Plaintiff

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Martin O'Malley has been substituted for Acting Commissioner Kilolo Kijakazi as the Defendant in this action.

[2] The precise date is unclear. See, e.g., Tr. 21 ("seven to eight years ago"), Tr. 303 ("2014"), Tr. 343 ("2014").

confirmed that the beginning of the period in issue in this case is not the day of alleged onset, but the day he applied for benefits, February 27, 2020.  Tr. 15.

The current application was denied by the Acting Commissioner of Social Security ("Commissioner") based on the decision of an ALJ who found that, during the period in issue, Plaintiff suffered from an array of severe physical and mental impairments,[3] but that he retained the RFC[4] to perform medium work with significant postural, some environmental and moderate mental limitations.  Tr. 17-20.  Plaintiff has moved for reversal of this adverse decision with an award of benefits.  ECF No. 13.  In his motion, Plaintiff alleges that the ALJ erred (1) in rejecting the opinions that Plaintiff has marked mental limitations in the consulting report (based on an examination) of the state agency consulting psychologist, Dr. Louis Turchetta; (2) in rejecting the RFC opinions of the long-time treating nurse practitioner, Nurse Kathleen Parker, who opined that Plaintiff has extreme exertional and postural limitations, as well as that the combined effect of Plaintiff's physical and mental conditions would cause him to be significantly off-task or absent; and (3) in relying instead on the prior administrative findings of the non-examining experts.  Id. at 8-23.  The Commissioner has filed a counter motion to affirm, arguing that the ALJ's findings are well supported by substantial evidence.  ECF No. 14.

The parties' motions have been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      Background

---

[3] These are: vertigo; chronic post-traumatic headache, intractable; degenerative disc disease; personality disorder; depression; anxiety; substance addiction; borderline intellectual functioning; and somatic symptom related disorder. Tr. 17.

[4] RFC refers to "residual functional capacity."  It is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 416.945(a)(1).

As of the date of the ALJ's hearing, Plaintiff presented as a man of forty-seven years of age who did not complete high school and was unable to pass the GED.  Tr. 389-90.  From a mental health perspective, based on his statements in connection with the application, during the hearing and in the Function and Work History Reports, Plaintiff was then living with an aunt and uncle; tried (for example, to cut the front grass) but effectively performed no chores; cannot drive; does not shop; has not worked in more than eighteen years[5]; stopped working in the early 2000s because he "was incarcerated and have been on and off for years"; struggles to get along with others ("rather be alone"), including getting along "very poorly" with people in authority; prefers to avoid any change in routine; and has no bank accounts.  Tr. 40-45, 210-12, 215, 228, 234, 245-48.  The hearing transcript reflects Plaintiff's struggle to comprehend the questions, for example testifying to "no mental health issues," but also that he is often irritable and easily aggravated, that he struggles to concentrate, that depression may prevent him from getting out of bed several times a week and that he "go[es] [to] sit in corner by myself."  Tr. 43-47.  When asked to explain what makes him anxious, Plaintiff was unable to respond ("[t]hat's a hard thing for me to answer").  Tr. 44.  The Function Reports are consistent, reflecting that Plaintiff goes outside the house daily for two to three hours a week to "sit outside when nice," but otherwise goes nowhere except for medical appointments and "stay[s] to myself."  Tr. 212-13, 245-46.  The ALJ did not explore any of these issues during the hearing, focusing (with respect to mental health) only on confirming Plaintiff's lack of current treatment with "any mental health specialist, psychiatrist, therapist."  Tr. 48.

---

[5] The preparer of the Work History Report noted "the one job he recalls was listed on application."  Tr. 234.  The application indicates work as a laborer in a nursery from 1995 to 2002, Tr. 229, but the employment record for this period reflects *de minimis* earnings (never more than $6000 in a single year and generally much less) and no more than intermittent work, with almost 40% of the quarters (twelve of thirty-two) reflecting no income at all.  Tr. 163-65.

As the ALJ confirmed, Plaintiff has received extremely limited mental health treatment –
only from his long-time (since at least 2018) primary care nurse practitioner, Nurse Parker.
Nurse Parker is not a mental health specialist.  The focus of Nurse Parker's treatment – both
prior to and during the period in issue – was on Plaintiff's frequent and severe headaches and
dizziness/vertigo.  E.g., Tr. 347-50, 433-37.  Regarding mental health, Nurse Parker's notes
reflect ongoing depression and anxiety, for which she prescribed increasing doses of medication,
but that Plaintiff "refuses to see counselor."  E.g., Tr. 359.  Her notes repeatedly advert to
Plaintiff's isolation, anger, agitation and fear of returning to jail.  See, e.g., Tr. 358 ("Mental
Status: anxious, depressed, and abnormal affect and active and alert, upset up with SO stays at
home in his corner 'to avoid getting into trouble.'"); Tr. 355 ("Behaviors – pain and headaches
making tension in life stress-anger-and anxiety attacks"); Tr. 357 ("elevated lately lexapro not
helping mood stressed and not sleeping does drink daily"); Tr. 361 ("increased behavior issues as
in the past after TBI 'do not want to go back to that person' was in jail until 4 years ago
worried"); id. ("Mental Status: anxious, depressed, agitated, and abnormal affect . . . upset . . .
recent memory abnormal and remote memory abnormal.").  Nurse Parker's 2018 notes reflect
her concerns that concentration and vertigo might be disabling conditions for Plaintiff.  Tr. 291
("concentration issues vertigo ?disability.").  However, by 2020, her mental health notes reflect
that Plaintiff had improved on medication and stabilized, although they do not describe how well
Plaintiff was able to function in light of this improvement.  Tr. 380 ("better on xanax and prozac
increased dose"); Tr. 416 ("Mental Status: anxious and abnormal affect and active and alert;
improved with meds"); Tr. 417 ("doing well meds stable mood better HA stable with meds and
rest"); but see Tr. 421 ("increased depression 'back in my corner' past 2 weeks).  That is, they do
not reveal how severely mentally impaired Plaintiff remained with medication.

The only other treating mental health observations (both of which appear in non-mental health records) in this record are normal findings (orientation, memory and attention) by the neurologist, Tr. 340-41, 343-44, and abnormal findings by a Lifespan physician performing a cardiac examination, Tr. 400 (MSE findings: "Positive for decreased concentration. The patient is nervous/anxious.").

Physically, Plaintiff alleges that he suffers from episodes of vertigo/dizziness, episodic numbness on one side of the body, memory and cognitive deficiencies and headaches several times a week based on a traumatic head injury experienced in 2014. E.g., Tr. 40-47. Nurse Parker's notes confirm these impairments, reflecting Plaintiff's unresolved physical issues with vertigo/dizziness and headaches, which predominate in her treating records. E.g., Tr. 413-17 (as of September 2021, despite treatment with neurologist who prescribed headache medication, Nurse Parker's note reflects that vertigo episodes "happen[] at least weekly," although headaches are "stable with meds," but patient "not able to walk or be upright for 3 min wiht out HA and dizziness"); Tr. 433-37 (as of September 2020, Nurse Parker's note reflects vertigo "happens at least weekly, feels lightheaded and 'blacks out' no syncope and report of "frequent or severe headaches").

Until the COVID pandemic began, Plaintiff was also seeing a neurologist for the headaches and dizziness. Tr. 48, 343. The neurologist's treating notes (from 2019 and early 2020) reflect that Plaintiff's dizziness and headaches are linked to a fall with loss of consciousness in 2014, for which he received no treatment at the time because he was immediately incarcerated. Tr. 340-343. After treatment with headache medication was initiated in 2019, Plaintiff continued to report both dizzy spells and headaches rated as seven on a ten-point pain scale occurring two to three times a week, although there is no indication of duration.

Tr. 340.  At the last appointment before the visits stopped with the start of the COVID pandemic, the neurologist noted that a brain abnormality was confirmed on an MRI and assessed diagnoses of chronic post-traumatic intractable headaches, which (despite some improvement with medication) were still occurring regularly and still causing severe pain; skin paresthesia; and a serious issue with dizziness ("[h]is main concern") that remained unexplained and was to be the subject of ongoing medical inquiry.  Tr. 340-42.  As far as the record reveals, Plaintiff never returned to the neurologist; it is unclear whether the pandemic may still have been an impediment as of when the record closed.

In addition to the vertigo and headaches, Plaintiff also alleges extreme physical limits on his ability to walk, sit, stand, and lift, as well as postural limits and musculoskeletal pain.  As with his other impairments, he treated for these complaints with Nurse Parker.  Her examinations sometimes reflect pain, tenderness and restricted motion, but normal gait and ambulation with normal muscle strength.  E.g., Tr. 416-17, 426-27, 436.

## II.    Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Irlanda Ortiz v. Sec'y of Health & Hum. Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Hum. Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999), aff'd, 230 F.3d 1347 (1st Cir. 2000) (per curiam).  Once the Court concludes that the decision is supported by substantial evidence and that the Commissioner correctly applied the law, the ALJ's decision must be affirmed, even if the Court

would have reached a contrary result as finder of fact.  <u>Rodriguez Pagan v. Sec'y of Health & Hum. Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).  The determination of substantiality is based upon an evaluation of the record as a whole.  <u>Brown</u>, 71 F. Supp. 2d at 30.  The Court may not reinterpret or reweigh the evidence or otherwise substitute its own judgment for that of the Commissioner.  <u>Id.</u> at 30-31 (citing <u>Colon v. Sec'y of Health & Hum. Servs.</u>, 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  <u>Id.</u> at 31 (citing <u>Rodriguez</u>, 647 F.2d at 222).

**III.    <u>Disability Determination</u>**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §§ 416.905; 416.909-911.

**A.    The Five-Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability.  <u>See</u> 20 C.F.R. § 416.920(a).  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  <u>Id.</u> § 416.920(a)(4)(i).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  <u>Id.</u> § 416.920(a)(4)(ii).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  <u>Id.</u> § 416.920(a)(4)(iii).  Fourth, if a

claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  Id.
§ 416.920(a)(4)(iv).  Fifth, if a claimant's impairments (considering RFC, age, education and
past work) prevent doing other work that exists in the local or national economy, a finding of
disabled is warranted.  Id. § 416.920(a)(4)(v).  The claimant bears the burden of proof at Steps
One through Four, but the Commissioner bears the burden at Step Five.  Sacilowski v. Saul, 959
F.3d 431, 434 (1st Cir. 2020); Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003).

**B.    Opinion Evidence**

An ALJ must consider the persuasiveness of all medical opinions in a claimant's case
record.  See 20 C.F.R. § 404.1520c.  The most important factors to be considered when the
Commissioner evaluates persuasiveness are supportability and consistency; these are usually the
only factors the ALJ is required to articulate.  20 C.F.R. § 404.1520c(b)(2); Jones v. Berryhill,
392 F. Supp. 3d 831, 839 (M.D. Tenn. 2019); Gorham v. Saul, Case No. 18-cv-853-SM, 2019
WL 3562689, at *5 (D.N.H. Aug. 6, 2019).  Supportability "includes an assessment of the
supporting objective medical evidence and other medical evidence, and how consistent the
medical opinion or . . . medical finding[] is with other evidence in the claim."  Revisions to Rules
Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5859 (Jan. 18, 2017).  Other
factors that are weighed in light of all of the evidence in the record include the medical source's
relationship with the claimant and specialization, as well as "other factors" that tend to support or
contradict the medical opinion or finding.  See 20 C.F.R. § 404.1520c(c)(1)-(5).

Since the recent revision to the regulations, medical opinions produced by state agency
medical consultants are referred to as "prior administrative medical findings."  Elizabeth L. v.
Kijakazi, C.A. No. 23-00008-WES, 2023 WL 5035123, at *7 (D.R.I. Aug. 24, 2023), adopted by
text order (D.R.I. Aug. 8, 2023).  The regulations now require that the ALJ "must" consider the

persuasiveness of such findings and articulate their consideration under 20 C.F.R. § 404.1520c(b)

because the medical consultants making those findings are "highly qualified and experts in

Social Security disability evaluation." Id. at *8 (internal quotation marks omitted). Such prior

administrative findings may not be disregarded as "inherently neither valuable nor persuasive"

pursuant to 20 C.F.R. § 404.1520b(c)(3). Id. at *7-8.

### C.    Claimant's Subjective Statements

A reviewing court will not disturb a clearly articulated credibility finding based on

substantial supporting evidence in the record. See Frustaglia v. Sec'y of Health & Hum. Servs.,

829 F.2d 192, 195 (1st Cir. 1987) (per curiam). Guidance in evaluating the claimant's statements

regarding the intensity, persistence and limiting effects of subjective symptoms, including pain,

is provided by SSR 16-3p, 2017 WL 5180304, at *2-8 (Oct. 25, 2017), which directs the ALJ to

consider the entire case record, including the objective medical evidence, the individual's

statements, statements and other information provided by medical sources and other persons, and

any other relevant evidence, as well as whether the subjective statements are consistent with the

medical signs and laboratory findings.  As the First Circuit has emphasized, in the absence of

direct evidence to rebut a claimant's testimony about subjective symptoms, such statements

should be taken as true. Sacilowski, 959 F.3d at 441; Tegan S. v. Saul, 546 F. Supp. 3d 162, 169

(D.R.I. 2021). That is, if proof of disability is based on subjective evidence and a credibility

determination is critical to the decision, the subjective statements must either be explicitly

discredited or the implication of lack of credibility must be so clear as to amount to a specific

credibility finding. Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995); Vanessa C. v.

Kijakazi, C.A. No. 20-363MSM, 2021 WL 3930347, at *4 (D.R.I. Sept. 2, 2021), adopted, 2021

WL 8342850 (D.R.I. Nov. 2, 2021). Although an individual's subjective statements as to pain

are not conclusive of disability, 42 U.S.C. §§ 423(d)(5)(A); 1382c(a)(3)(H)(i), an ALJ's "extreme insistence on objective medical findings to corroborate subjective testimony of limitation of function because of pain" is error.  Amanda B. v. Kijakazi, C.A. No. 21-308MSM, 2022 WL 3025752, at *3 (D.R.I. Aug. 1, 2022) (internal quotation marks omitted), adopted, 2022 WL 18910865 (D.R.I. Nov. 7, 2022).

### D.    Absenteeism

When the symptoms of an impairment or combination of impairments would cause the claimant periodically to be unable to attend work, it is reversible error if the ALJ fails specifically to assess the issue of absenteeism.  Sacilowski, 959 F.3d 431 (error to fail to consider probable absenteeism caused by migraines/bladder issues that recur despite medication); Jacquelyn V. v. Kijakazi, C.A. No. 21-314MSM, 2023 WL 371976, at *5 (D.R.I. Jan. 24, 2023), adopted by text order (D.R.I. Mar.7, 2023).  Remand is similarly required if the ALJ relies on the findings of non-examining physician experts who did not address absenteeism.  Jessica S. v. Kijakazi, C.A. No. 21-75MSM, 2022 WL 522561, at *4-6 (D.R.I. Feb. 22, 2022), adopted, 2022 WL 834019 (D.R.I. Mar. 21, 2022) (non-examining experts "did not have access to a sufficiently developed record to permit them even to consider how the total number of medical appointments and hospitalizations would impact work attendance").  That is, whether at Step Two or at the RFC phase, it is error for an ALJ to ignore the impact on the ability to work of the combined effect of multiple impairments that could impact attendance when it is "undisputed that [the claimant's medical] issues required ongoing treatment throughout [an extended period]." Sacilowski, 959 F.3d at 435-36; see 20 C.F.R. § 404.1523(b) (requirement to consider combined effect of multiple impairments).  This is particularly true when a treating source's longtime

familiarity with a claimant and multiple ailments confirms that their combined effect would result in absenteeism.  See Sacilowski, 959 F.3d at 440-41.

III.    **Facts and Analysis**

    A.    **Consulting Psychologist, Dr. Louis Turchetta**

Dr. Louis Turchetta is a state agency consulting psychologist who performed two examinations of Plaintiff.  First, in February 2019, in connection with Plaintiff's prior application, Dr. Turchetta performed an evaluation that included clinical testing (Wechsler IQ and Wide Range achievement tests), the CUDOS/CUXOS depression/anxiety screens, an MSE and a clinical interview.  Tr. 303.  Dr. Turchetta's report details Plaintiff's limitations, including a full-scale IQ of just 73; the lack of a GED; lack of driver's license; limited work history; history of incarceration; limited social network; the struggle to control his temper; limited judgment of social situations; the inability to trust others; and the increase in mental health symptoms since the significant brain injury in 2014.  Tr. 303-06.  Dr. Turchetta's report includes the clinical observations that Plaintiff appeared "anxious and jittery . . . sad, depressed and pensive," with the need for "task clarification when presented with complex information."  Tr. 303.  Based on this examination and the results of testing, Dr. Turchetta opined that Plaintiff suffers from borderline intellectual functioning, panic disorder, major depressive disorder (moderate), reading disorder and personality disorder, with a "poor" prognosis and "marked" impairments in both the ability to respond to supervision and co-workers and the ability to deal with normal work pressures.  Tr. 306.  The report notes that Plaintiff's "medical conditions [also] . . . impact his ability to persist and sustain on-task performance for an extended period of time."  Id.

For the application now in issue, Dr. Turchetta examined Plaintiff again a year and half later (in July 2020).  During this second encounter, Dr. Turchetta performed a mental status

examination and a clinical interview and administered another set of CUDOS/CUXOS screens. Tr. 392.  For the second assessment, Dr. Turchetta did not perform the IQ and achievement tests he had done during his first examination; therefore, this report does not include a diagnosis of borderline intellectual functioning.[6]  Based on this examination, Dr. Turchetta opined that Plaintiff suffers from personality disorder, panic disorder with agoraphobic features, and major depressive disorder (recurrent, moderate).  Tr. 392.  Dr. Turchetta found that Plaintiff's prognosis was "not expected to improve with treatment over the next twelve months," and that he suffers from "marked" impact on his ability to sustain attention, concentrate, focus and perform tasks, to respond to supervision and co-workers, and to respond to normal work pressures.  Tr. 392.  Dr. Turchetta's clinical analysis relies *inter alia* on Plaintiff's "terrible" childhood, the lack of friends and social isolation in school and throughout his adult life, frequent school discipline, poor academic performance, inability (despite an attempt) to get a GED, and limited employment history (including no work in twenty years) coupled with his criminal history for such conduct as sexual assault, disorderly conduct and the violation of no-contact orders, as well as the history of head injuries.  Tr. 389-91.  Dr. Turchetta estimated Plaintiff's cognitive ability to be low average, with decreased comprehension and judgment of social situations.  Tr. 391.  In this second assessment, Dr. Turchetta included his recommendation that, if awarded funds, Plaintiff "may require assistance in managing them."  Tr. 392.

There is no record evidence that any of the clinical history that Dr. Turchetta relied on as foundational to either of his opinions is materially false or inaccurate.  There is also no

---

[6] This does not reflect that Plaintiff's IQ and achievement levels improved, as the ALJ acknowledged by including the impairments of borderline intellectual functioning and learning disorder among the severe conditions that he found at Step Two.  Tr. 17.  That is, it is undisputed that Plaintiff has significant cognitive and memory limitations.  See Tr. 18 (ALJ's finding of moderate limits in the ability to understand and remember).

suggestion that Dr. Turchetta's second report is simply copied from the first – thus, the very similar conclusions that Dr. Turchetta reached in each of these reports (marked impairments in at least two of the major functional spheres with a poor prognosis) essentially corroborate each other in that each is the product of a separate clinical examination performed by a well-qualified consulting psychologist chosen by the Social Security Administration ("SSA") to perform this analysis.

Despite Dr. Turchetta's findings of marked mental impairments in at least two functional areas, the ALJ found only moderate mental limitations at Step Three. Tr 18-19. At the RFC phase, the ALJ considered Dr. Turchetta's medical opinions[7] but found them unpersuasive because they are "based on Dr. Turchetta's one-time evaluation and even appear[] to rely more heavily on the claimant's subjective complaints than his own clinical findings," as well as because Dr. Turchetta alluded to the impact of "physical conditions" on mental functioning, which is outside his expertise. Tr. 26. The ALJ also compared Dr. Turchetta's findings to the treating record and found that they clash with what the ALJ found to be Plaintiff's "conservative treatment" and his improvement and "stab[ility]" in response to mental health medication as reflected in Nurse Parker's notes. Tr. 24.

There are significant problems with these reasons for rejecting Dr. Turchetta's opinions.

First is the reality that Dr. Turchetta did not perform just a single "one-time evaluation." Tr. 26. Rather, the record before the ALJ, and now before this Court, includes both Dr. Turchetta's 2019 report and his 2020 report and reflects the consistency of Dr. Turchetta's

---

[7] I reject the Commissioner's argument that Dr. Turchetta's opinions regarding marked limitations in specified functional spheres are so vague that they do not constitute "medical opinions." ECF No. 14 at 8-12. In fact, Dr. Turchetta's opinion is specific in addressing Plaintiff's capabilities in the same functional spheres that are addressed by the non-examining expert psychologists. And the ALJ recognized that Dr. Turchetta's findings are sufficiently specific and considered them as he would a medical opinion. Tr. 26.

opinions based on different examinations using somewhat different assessment tools and separated in time by a year and a half.  Further, the ALJ clearly considered and found persuasive the 2019 report because he adopted the impairment of borderline intellectual functioning, which appears nowhere else in this record.  See supra n.5.  Nor does the record otherwise reveal that any foundational information mentioned in either of Dr. Turchetta's reports is materially false, potentially skewing the results.  And the resulting opinions both include the critical findings that Plaintiff's prognosis is poor and that he is markedly impaired at a minimum in his ability to respond to supervision and co-workers and to respond to normal work pressures.  Thus, this reason to discount the opinions of the only mental health specialist to examine Plaintiff is not supported by substantial evidence.  Nor does this conclusion change in consideration of the ALJ's reliance on the non-examining expert psychologists – they expressly rejected Dr. Turchetta's opinions for the same flawed reason.  Tr. 73 ("Dr. Turchetta's . . . opinion . . . is not persuasive because it is based on a one time assessment"); Tr. 83 (same).

Second is the ALJ's baseless critique that Dr. Turchetta relied on Plaintiff's subjective complaints instead of on his own clinical findings.  Notably, in including this reason, the ALJ did not rely on the state agency psychologists, because neither of them made such a finding.  Instead, despite lacking the expertise to do so, the ALJ reinterpreted Dr. Turchetta's findings in reliance on a premise that is simply wrong.  For starters, the 2019 report relies on unambiguously objective IQ and achievement tests, the results of which the ALJ accepted.  And for both reports, Dr. Turchetta used a clinical interview and an MSE; these are well accepted as the basis for a psychologist's opinion.  Vay v. Berryhill, C.A. No. CV 16-460JJM, 2017 WL 6820039, at *5 (D.R.I. Dec. 18, 2017) ("ALJ is wrong in labelling a clinical interview and mental status examination performed by a qualified professional . . . as a mere recital of subjective

complaints."), adopted, 2018 WL 333826 (D.R.I. Jan. 8, 2018).  Indeed, the MSE is considered to be "an objective clinical assessment of an individual's mental ability, based on a health professional's personal observation, where experienced clinicians attend to detail and subtlety in behavior, such as the affect accompanying thought or ideas, the significance of gesture or mannerism, and the unspoken message of conversation."  Lilibeth G. v. Kijakazi, C.A. No. 20-474WES, 2021 WL 5049377, at *1 n.4 (D.R.I. Nov. 1, 2021), adopted, 2021 WL 5631745 (D.R.I. Dec. 1, 2021) (emphasis added) (internal quotation marks omitted).  That leaves only Dr. Turchetta's use of the self-report CUDOS/CUXOS screening tools.  While these tools certainly use a claimants' subjective descriptions as a device to evaluate and diagnose, the only opinion found addressing the issue has held that the "use of [such] subjective self-report tool[s] to make objective psychiatric findings should not [be] discredited."  James v. Liberty Life Assur. Co. of Bos., 582 F. App'x 581, 588 (6th Cir. 2014).

Third, the ALJ's Step Two and RFC analysis of the two areas in which Dr. Turchetta consistently found "marked" limitations are tainted by the ALJ's disregard of the undisputed evidence regarding how Plaintiff actually functioned.  For example, the ALJ relies on the skimpy record references to Plaintiff's "cooperative[ness]" and ability to maintain eye contact during treatment appointments to find Plaintiff's social limits to be moderate and not marked as Dr. Turchetta opined.  Tr. 19.  In so doing, the ALJ (and the state agency psychologists on whom he relied) completely ignored the clinically material facts considered by Dr. Turchetta, particularly Plaintiff's criminal history reflecting sporadic incarceration for disorderly conduct, assault and no-contact order violations and utter lack of any employment or other activities even during periods when he was not in jail.  Similarly, the ALJ found only moderate impairment in the ability to concentrate, persist and maintain pace (which Dr. Turchetta found to be markedly

impaired) based on the supposed absence of evidence of "depressed cognition" or of distraction at medical appointments. Tr. 19. Yet those are precisely the objective observations made by Dr. Turchetta, who is the only mental health specialist to observe Plaintiff; further, while not extensive, the treating record does reflect at least some such evidence.[8] E.g., Tr. 361 (agitated with memory abnormal); Tr. 400 (decreased concentration, nervous, anxious). Thus, the ALJ is wrong in relying on this finding. Consistent with these errors, the ALJ supported his finding of only moderate adaptive limitations with the lack of "evidence indicating erratic or dangerous behavior or emotional instability"; this ignores entirely Plaintiff's clinically significant twenty-year history of being in and out of jail for precisely such conduct, as Dr. Turchetta noted. Tr. 19.

Fourth, the ALJ's rejection of the Turchetta opinions as unpersuasive lacks the support of substantial evidence because it is based on the ALJ's flawed finding that Plaintiff needed only "conservative treatment . . . requiring no specialized mental health treatment" and had "essentially benign findings, and reports of good medication response and stability." Tr. 26. While the ALJ is right that Nurse Parker's notes record that Plaintiff was "stable" and "better," Tr. 24, with mental health medication (particularly after an increase in dosage), this is a case where the record supportably reflects, for example, the mental health diagnosis of anxiety with agoraphobic features, yet neither the non-examining experts nor the ALJ considered whether Plaintiff's failure to seek mental health treatment with a specialist (including therapy, which Nurse Parker offered and Plaintiff refused, Tr. 359) evidences that he suffers from a "marked" social limitation, as Dr. Turchetta found, or whether the lack of treatment is the result of the lack

---

[8] Importantly, Dr. Turchetta's observations are consistent with those of Nurse Parker, who opined that Plaintiff's "guarded" prognosis derives from symptoms that include memory issues, decreased concentration, mood disorder, anger, anxiety, depression and "moody agitation," with mood changes impacted by the pain of headaches. Tr. 373-77; see also Tr. 400 (Lifespan physician observes: "Positive for decreased concentration. The patient is nervous/anxious.").

of serious symptoms as the ALJ impliedly found.  Without such an inquiry, it is error for the ALJ to rely on the lack of more aggressive treatment as the basis for ignoring Dr. Turchetta's opinions.  Michael D. v. Saul, C.A. No. 19-157JJM, 2020 WL 999872, at *7 (D.R.I. Mar. 2, 2020) (when ALJ has medical opinion from well-qualified source aware of lack of treatment that mental impairment nevertheless meets listing, it is error to disregard such opinion without any competing medical opinion that lack of treatment medically undermines expert's conclusion), adopted by text order (D.R.I. Mar. 17, 2020).  Importantly, as in Michael D., Dr. Turchetta was aware that Plaintiff had never been hospitalized for mental health concerns and never engaged in formal therapy but nevertheless found a poor prognosis and marked impairment in at least two functional spheres.  Tr. 391.  Neither of the non-examining psychologists addressed this concern.

Finally, I find that the ALJ erred, as did the non-examining psychologists, in finding that Dr. Turchetta's opinions are unpersuasive to the extent that he considered the impact on mental functioning of "medical conditions" that are beyond his ken as a psychologist.  The problem with this reason is that the ALJ accepted that Plaintiff suffered from severe "medical conditions"; thus, it is undisputed that Plaintiff had vertigo, chronic post-traumatic headache (intractable), and degenerative disc disease, all of which the ALJ found at Step Two significantly limited his ability to perform basis work activities.  Tr. 17.  And Dr. Turchetta did not purport to diagnose these conditions; rather, he deployed his expertise as a psychologist to appropriately consider their impact on Plaintiff's emotional symptoms.  Recognizing that disability may be based on the combined impact of physical and mental impairments, Charles C. v. Commissioner of Social Security, Civil No. 22-6542 (RMB), 2023 WL 6875104, at *5-8 (D.N.J. Oct. 18, 2023), I find that the ALJ erred in finding Dr. Turchetta to be unpersuasive because he considered just that.[9]

---

[9] Importantly, Dr. Turchetta's opinions regarding the combined impact of physical conditions like headache pain, vertigo and back pain on mental functioning synch with Nurse Parker's assessment based on her longitudinal

Relatedly, I find the non-examining psychologist's failure to consider the impact of Plaintiff's medical conditions (particularly, headaches, vertigo and pain) on his ability both to adapt and to concentrate, persist and attend taints the ALJ's reliance on them.

Based on the foregoing, I find that the ALJ's rejection of the Turchetta opinions as unpersuasive is seriously flawed and that his reasons for discounting them lack the support of substantial evidence. I further find that the ALJ erred in relying on the non-examining psychologists to the extent that their findings clash with the Turchetta opinions. Therefore, I recommend remand for further consideration of Plaintiff's mental health limitations.

### B.     Treating Nurse Practitioner, Nurse Kathleen Parker

Except for two appointments with a neurology practice and one appointment with a cariologist, Nurse Parker is the provider of virtually all of the treatment – for both physical and mental conditions – that Plaintiff has received as reflected in the record prior to and during the period in issue. Dated May 11, 2020, Nurse Parker submitted a medical opinion on a form titled "<u>Physical</u> Medical Opinion," Tr. 373 (emphasis added), that is largely focused (like her treating notes) on the impact of Plaintiff's chronic headaches (despite treatment), dizziness/vertigo, and episodic numbness but that also highlights the impact of Plaintiff's mental and cognitive limitations, including as exacerbated by pain. Echoing Dr. Turchetta,[10] she opines that Plaintiff's prognosis is "guarded," that his symptoms include memory issues, decreased concentration and

---

treating observations of Plaintiff. Thus, Nurse Parker noted that Plaintiff's prognosis is "guarded" and that his mental symptoms (including anger, anxiety, depression, memory issues, decreased concentration and mood disorder) are adversely impacted by the pain of headaches; she relied on these findings in support of her opinion that Plaintiff is incapable of even low stress work and, if working, would be significantly off-task and frequently absent. Importantly, this aspect of Nurse Parker's opinion takes into account Plaintiff's improvement with headache and mental health medication. Tr. 373-77.

[10] As far as the record reveals, Nurse Parker did not see the Turchetta report and Dr. Turchetta did not see Nurse Parker's treating notes or her opinion. Thus, the convergence of their opinions on key matters such as prognosis can only be because these two medical professionals who actually examined Plaintiff reached the same conclusions.

mood disorder, with mood changes impacted by the pain of headaches.  Tr. 373-76.  She includes

depression, anxiety and "moody agitation" as psychological conditions that impact Plaintiff's

physical condition, that Plaintiff is incapable of even low stress work, and that her opinion

regarding Plaintiff's limits caused by "anger, anxiety, depression" takes into account Plaintiff's

improvement with mental health medication.  Tr. 374-77.  Based on these impairments, Nurse

Parker's opinion endorses the likelihood that Plaintiff would be off task 25% or more of the day

and would miss more than four days of work per month.  Tr. 376.  Nurse Parker's opinion also

reflects work-preclusive exertional (walking, sitting, standing and lifting) and postural

limitations.  Tr. 374-75.

 The ALJ found the Parker opinion to be entirely unpersuasive based on his findings that it

is unsupported by Nurse Parker's treating notes and is contradicted by the neurology record and

Plaintiff's conservative course of treatment.  Tr. 23-27.  The ALJ also concluded from Nurse

Parker's notation that she was "on phone wiht pt 25 in filing out ssdii form," Tr. 380, that her

opinion was based not on her clinical observations over several years of treatment, but rather on

Plaintiff's subjective (and unsupported) statements during this conversation.  Tr. 27.  Based on

this finding (coupled with his rejection of the opinions in the Turchetta report), the ALJ relied

instead on the non-examining psychologists' moderate findings to set Plaintiff's mental health

RFC.  As to Plaintiff's exertional and postural limitations, the ALJ relied instead on the non-

examining physicians' findings supporting an RFC to perform medium work with some postural

and environmental limits.  Tr. 25-27.

 Regarding headaches and dizziness/vertigo, the record reflects that both the neurologist

and Nurse Parker accepted Plaintiff's consistent reports of serious symptoms as reliable, with the

dizziness particularly concerning and unexplained.  Thus, while the ALJ is right that only

conservative treatment was prescribed by the neurologist to reduce the severity of the headaches, the record also reflects that this treatment did not eliminate them or address the dizziness; the diagnostic inquiry was still ongoing when the pandemic stopped it. As of when the record closed, Plaintiff had not returned to the neurologist and the dizziness remained untreated. Further, while the mental health treating record is certainly sparse, the ALJ is wrong in finding that it is inconsistent with Nurse Parker's opinion (similar to that of Dr. Turchetta) with respect to the debilitating <u>combined effect</u> of Plaintiff's physical and mental impairments. See n.9 *supra*. Thus, as to his rejection of Nurse Parker's opinion regarding Plaintiff's mental impairments as impacted by headaches, vertigo and pain[11] on his ability to be on task and attend work, I find that the ALJ's decision lacks the support of substantial evidence.

Relatedly, I also find flaw in the ALJ's reliance on the file-reviewing psychologists because their analysis of Plaintiff's ability to concentrate was focused only on mood and irritability; they failed to consider the combined effects of Plaintiff's physical and mental impairments. Sacilowski, 959 F. 3d 440-41 (error to fail to consider probable absenteeism caused by migraines/bladder issues that recur despite medication); Jessica S., 2022 WL 522561, at *4-6 (remand is required if ALJ relies on non-examining physician experts who did not address absenteeism). Further, their findings (particularly their finding of only moderate limits in the ability to handle supervision and co-workers) are tainted by their reliance on the inaccurate fact that Plaintiff had meaningful past work experience "in automotive and nursery." Tr. 72-73, 82. In fact, as reflected in the employment record, Nurse Parker's treating notes and Dr. Turchetta's report, Plaintiff has almost no work experience of any sort throughout his life. Thus,

---

[11] To be clear, I do not find error in the ALJ's failure to find that Plaintiff is disabled by the symptoms of each of these impairments in isolation. By way of just one example, this is not a case where the evidence of the severity of the headaches is sufficient to establish a serious risk of significant absenteeism due just to the headaches and bladder issues, as the Court found in Sacilowski, 959 F.3d at 431.

the non-examining experts appear to have based their findings at least in part on their misapprehension that Plaintiff had functioned well enough in the past to sustain work.

In contrast to the errors undermining the mental RFC, I find no error in the ALJ's analysis of Plaintiff's claim of extreme exertional and postural limits.  Here, the ALJ is right that the observations in Nurse Parker's notes and the balance of the treating record (including normal gait and ambulation and normal muscle strength) do not support her opinion, for example, that Plaintiff could not walk or even sit for a total of two hours over the course of a workday; Plaintiff's subjective statements regarding such limits are directly rebutted by the same evidence.  Tr. 374.  Thus, the ALJ's comment about Nurse Parker's having spent twenty-five minutes on the phone with Plaintiff to fill the SSI form tends to support the ALJ's finding that this aspect of the opinion is derived from Plaintiff's subjective statements during the call and not from Nurse Parker's own observations.  And unlike Nurse Parker's opinion about being off-task or absent due to mental issues, which is corroborated by Dr. Turchetta's opinions, there is no corroborating medical opinion in support of these extreme findings.  Instead, as to these functional areas, this is a case with conflicting medical opinions: Nurse Parker on one hand, and, on the other, the two sets of findings from the non-examining physicians, who considered all of the relevant evidence and supportably found that Plaintiff is physically limited, albeit not to the extent alleged.  There is no error when, as here, an ALJ considers competing medical opinions regarding Plaintiff's physical limits, relies on substantial evidence and exercises his discretion to resolve the conflict by elevating one over another.  See Leonard P. v. Saul, C.A. No. 19-418-WES, 2020 WL 1181598, at *8 (D.R.I. Mar. 12, 2020), adopted, 2020 WL 1862970 (D.R.I. Apr. 14, 2020) (no error for ALJ faced with conflicting medical opinions to exercise discretion based on substantial evidence to resolve conflict in favor of SSA expert).

Based on the foregoing, I find that the ALJ erred in part, to the extent that he found the Nurse Parker opinion to be unpersuasive with respect to the combined effect of Plaintiff's physical and mental impairments on his ability to concentrate and persist during the workday, as well as on his ability to attend and avoid excessive absenteeism. I also find error in the ALJ's reliance instead on the non-examining psychologists' findings of only moderate mental limitations. Therefore, I recommend remand for further consideration of these findings and this aspect of the Parker opinion.

### C.  Purpose of Remand

Plaintiff argues that this is a case where remand for an award of benefits is appropriate because of the absence of evidence contrary to Plaintiff's consistent subjective statements regarding headache pain (despite medication) and vertigo. See Ogannes B. v. Kijakazi, No. CV 22-325WES, 2023 WL 5561108, at *12 (D.R.I. Aug. 29, 2023), adopted by text order (D.R.I. Sept. 13, 2023). I do not agree. This is a case where the ALJ struggled to address the interaction of complex medical and mental health issues despite many normal findings on examination, coupled with a lack of specialized treatment – both the lack of any mental health specialty treatment and the lack of resumed treatment with the neurologist – neither of which is adequately explained. Further, Plaintiff's subjective statements during the hearing appear to be contradicted, at least in part, by the less extreme statements he made to Nurse Parker. Compare Tr. 41 (at hearing Plaintiff testifies that dizzy spells are daily and headaches come three to four a week and mostly require him to lie down all day), with Tr. 417 (Plaintiff tells Nurse Parker vertigo happens at least weekly, but "no syncope," and "HA stable with meds and rest"). Further, it is unclear whether a qualified specialist would opine that Plaintiff's subjective statements during the hearing about the severity of these episodes are contradicted by the objective tests results in the

record.  My recommendation is that the matter be remanded for further proceedings to explore these issues, as highlighted above.  I do not recommend that the Court enter judgment for an award of benefits.

## IV.    **Conclusion**

Based on the foregoing, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 13) be GRANTED, with remand for further proceedings, not for an award of benefits, and that the Commissioner's Motion for an Order Affirming her Decision (ECF No. 14) be DENIED.  Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.  See Brenner v. Williams-Sonoma, Inc., 867 F.3d 294, 297 n.7 (1st Cir. 2017); Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
December 22, 2023